Your Honor, the central issue in this case is whether the district court erred in finding that the taint from the illegal interrogation at the Boat Harbor attenuated sufficiently where the waiver of the Miranda rights of Holly Koliopoulos was given at 3 o'clock in the morning. We submit, Your Honor, based upon the de novo review by this court, because the issue is voluntary, that the taint of the illegal interrogation did not get sufficiently attenuated. Counsel, is it your argument that this was the classic two-step kind of approach? Good guy, bad guy, that kind of thing? Your Honor, possibly, although the facts are not on all fours, possibly you could argue that this was a two-step interrogation similar to the Williams case. But what is in the record that would justify that? I need some help on that because I didn't find much. Your Honor, in the Williams case, the due state indicted that if you look at the length of time between the initial contact and when the Miranda is given, the longer the time case, the greater the chance of possibly there is officer misconduct. In this case, the judge did rule that from the time of initial contact at 10.30 in the night, they had probable cause to arrest. They did not. They waited until 3 o'clock the following morning, over four and a half hours later, to give her her Miranda warning. Secondly, in regards to any kind of intervening circumstance that the district court found, all the district court found was that two hours passed, or more than two hours passed. But if you look at the Lewis case, there was a break in the law enforcement contact. There was the first interrogation, the law enforcement left, then they came back the following day, then they continued on with the second interrogation. That would be an intervening circumstance. Thirdly, in regards to flagrant and purposeful officer misconduct, yes, it may not have been flagrant, but if you look at the facts in the case, you can find that there are many, many questions that need to be answered. First, Officer Feeley, who interviewed Ollie Koleopolis, testified that the temperature in the interview room was comfortable, but yet Ollie Koleopolis said that she was cold, so she needed something to wear, so he gave her her jacket or sweatshirt. Officer Camacho, who was right there next to him, said and testified that Ollie Koleopolis did not say she was too cold or too hot, and that nothing was given to her. Now, these are two diametrically opposed testimonies by two law enforcement officers in the same room with the defendant. Plus, Officer Feeley, who stated that Ollie Koleopolis was given her sweatshirt or jacket during the interview because she was cold, testified earlier that at the boat harbor four hours before, she was given her sweatshirt or her jacket. Now, who has the burden on this issue? Obviously, this is a question of whether this constituted a two-step procedure that's in violative of the Miranda rights of your client. Who has the burden to show this? Is it you or is it the government? Well, Your Honor, in terms of, we would argue it would be the government in the sense that because no Miranda rights were given, but there was the first illegal interrogation, that the burden is on the government to prove that the taint dissipated sufficiently that you could have a voluntary waiver of the Miranda rights. Okay, and this, of course, is what the government claimed. This was not attenuated that the initial arrest was around 10-30-11, not arrest, but the detention 10-30-11. You had basically except for one officer, different people involved. They told her she could go according to the officers. They have argued their case that it's a, these are two separate issues. They didn't take any testimony from the pre-Mirandaized statements. They only took it subsequently. So you're saying that it's the government's burden to show this and they, I'm sure, would claim that they have done so. What evidence would you like us to look at that would show that there was attenuation here and that this is a classic two-step interrogation where the Miranda rights of your client were violated? Well, Your Honor, first of all, we argue that there was no, the attenuation was not sufficient. What we would look at is, first, you would have to look at the initial illegal interrogation. Now, Holly Koliopoulos, it was 10-30 at night. It was raining. There were like 15 law enforcement. There was a police helicopter hovering overhead 300 to 500 feet shining its spotlight. When she was accompanied to the truck with three officers, there were five to eight other officers within 5 to 20 feet of her. The others who were there were within eyesight of her, plus her fanny pack, her ID, her cell phone, and then subsequently the keys to her sole means of transportation were taken away. So you're basically saying that whatever the police said, the reality is that this was a very intimidating situation. She really wasn't free to leave. Yes, she was not free to leave, and that's what the district court found, that although you can look at the testimony of the officers, you need to look at the totality of circumstances, and looking at the totality of circumstances, one would definitely reasonably conclude that you're not free to leave. Do you have any evidence, counsel, that testimony given by your client before three o'clock when she was Mirandized, according to the record, has been used in any way by the government in prosecuting this case? No, your honor. The government complied with the suppression order, and all the statements pre-Miranda were not used. However, what we are arguing is that, you know, the paint did not sufficiently dissipate, because when Agent Camacho testified at trial, he testified and concluded that polycholeopolis was, you know, evasive, that Stephen Eccles, the co-defendant, an unidentified conspirator, was a drug user, had methamphetamines, and that it was, I'm sorry, your honor, basically that, you know, all these facts together would lead one to conclude that she could not have voluntarily waived her Miranda rights. So your point is, even though the testimony, pre-Mirandized testimony was suppressed, that there was no way she could have voluntarily made a statement even after being Mirandized. Is that your position? No, your honor. Yes, she could have been Mirandized and then voluntarily give her waiver. However, it was three in the morning, it was four and a half hours, she was under sedation, because as admitted to by Agent Camacho, she seemed like she was under the influence, which she did tell Agent Feeley earlier, it's because of the medication she was taking. Counselor, you're almost out of time. You might want to say something about the Rule 29 motion, sufficiency? Yes, your honor. In regards to the Rule 29 motion, there was basically no evidence that polycholeopolis knew that there was iodine in the package because of the testimony of Stephen Echols or that she knew that iodine is used to make methamphetamines. The meth lab at the home and all the evidence in plain view that the government sees were because as a testimony of Stephen Echols, he was making a batch that morning at six o'clock in the morning, got a call from polycholeopolis' friend that she was just arrested, so he concluded that the next stop of law enforcement would be at the home, and yes, it was at the home, and that's why you had all these things out there in plain view. It's not because polycholeopolis may have been quote-unquote aware of a meth lab, but not specifically that the iodine was needed to make methamphetamines or that there was iodine in the package because polycholeopolis was more because she did state to the UPS store employees, I don't want to do anything illegal. All right, thank you, counsel. Your time has expired. We'll now hear from the government. Good morning, your honors. May it please the court, my name is Candace Kelly on behalf of the United States. I'd first like to address the Miranda issue in this case and specifically whether or not this was a two-step process as was described in the Williams case. The government's position is that it was not at all a two-step process. This was a situation where when Ms. Coleopolis was initially detained at the boat harbor, even as the district court said, it was a close call whether or not that was even a custodial situation and whether or not any and I think that reading the district court's opinion, the oral statements of the district court, it was really that her keys were taken and her fanny pack and her cell phone were taken from her and obviously in conjunction with the fact that there was law enforcement activity. But I think that the appellant conflates the ideas of being in custody and being coerced in that first boat to the truck answered certain questions. In the record, it doesn't appear that there was a full interrogation or that there was any sort of a confession. The statements are limited to the fact that she was driving the truck. The truck belonged to her boyfriend, Stephen Echols, and she gave consent to search the truck eventually and to retrieve that parcel. So there were no statements that actually went to the elements of the crime that the government had to prove. And therefore, given that there weren't any statements, those statements could not have, none of the statements that she made at the boat harbor voluntarily, albeit in technical violation of Miranda, could have been used to coerce a similar confession as was done in the Williams case and other cases where basically a confession is elicited from the defendant before Miranda is given. And then Miranda is given and those statements are used. The fact that the defendant has already made a confession is what's used to coerce a similar statement post-Miranda. That was not the situation in this case. There was a break in time as well. She was taken to the airport office. She was in a normal interview room. There's some discussion about the temperature. It didn't seem that there was, there might have been some confusion as to whether she complained about being cold at the office or at the boat harbor, but that doesn't rise to the level of coercion. It's a comfortable place. It's a normal interview room. There are two witnesses that testified to her being administered her Miranda warnings in a very careful manner that she answered, that she understood each right. She initialed each line of each of her rights and she knowingly and voluntarily waived those rights. So therefore, there need not be a taint analysis in reality because the initial statements were voluntarily made even though Miranda wasn't given. But even if a taint analysis were conducted, there's no taint from those initial statements on the subsequent Miranda statements. With respect to the sufficiency of evidence, I think that there is abundant evidence of Ms. Coleopolis' knowledge that this package had iodine in it and that the iodine would be used to manufacture methamphetamine. First, the package that she retrieved had iodine written on the front of the package. So in terms of any reasonable gerb making an inference as to whether or not she knew the package contained iodine, it was written on the front of the package. There's also testimony that she had told Mr. Eccles and the agents that she was aware that the package was from London. So with a package that simply has an address and contents in it, if she's read the fact that it's from London, I think it's a reasonable inference for a jury to make that she was aware of what the package contained. Counsel, does it matter whether there really was iodine in the package? Well, Your Honor, the charge was actually attempted possession. So there really wasn't iodine in this package. It was a controlled delivery situation. So they had put pseudo-iodine in there. And given that it was charged as an attempted possession, I think it does not matter. Simply that that was what she believed that she was obtaining and she was going to bring that to Mr. Eccles. There's also some testimony, as I recall, that she claimed she thought it was marijuana. Is the government's position that she may very well have said that, but a reasonable juror could have believed that she thought she was picking up iodine being delivered from London? Yes, Your Honor. The issue of the marijuana came from a separate note that was inadvertently left in the mailbox. It had something to the effect of two kilos of marijuana. The agents testified that that had to do with a completely different case. And she, having read that, was asking a lot of questions. And I think, actually, those were many of the questions that she was asking at the boat harbor. But there was no connection between that note and the package. And there would be no reason for her to believe that the package that said iodine up front contained anything other than iodine. And with respect to whether or not she knew that was going to be used to make methamphetamine, her co-defendant, co-conspirator Stephen Echols, testified that he had discussed his manufacture of methamphetamine with her. He talked about how she would purchase cold remedies, and she had cold remedies in the truck when she was driving it that were used to make methamphetamine. He testified that she often actually helped to push the pills out of the blister packs to help in the manufacture of methamphetamine. And the photographs, there were numerous photographs of the home that she and her and Mr. Echols lived in that clearly showed that there was a methamphetamine lab there. Whether some of it was recently done, whether Mr. Echols dumped some of the batch that he was cooking or not that morning, there was staining throughout many of the rooms on the walls, on the ceilings. There was an odor in the house. It may have been stronger because he was dumping things at that time, but the expert testimony was that this was a very, the odor that was coming from that house was distinctly a methamphetamine lab. And finally, she also, there was testimony from Mr. Echols about the cover story that she and Mr. Echols had concocted about how they were going to explain the iodine, and whether or not that was to explain this iodine that she was picking up or a previous purchase of iodine tincture that she, Echols testified that she had purchased iodine in the past for him. There was a, her purse in her room was found with a to-do list written by Echols that had iodine on the list, and he explained that he had in the past asked her to purchase iodine for the manufacture of methamphetamine. So it was not a miscarriage of justice for the jury to convict her on this count. There was sufficient evidence, and there was no error with respect to the statements that were admitted after the murder. Thank you. Thank you, counsel. The case just argued will be submitted for decision.
judges: O'scannlain, Tashima, Smith